**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

MICHAEL TORRES, individually and on behalf of all others similarly situated,

Plaintiff,

v.

SYSCO CORPORATION,

Defendant.

Case No. 4:26-cv-05469

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Michael Torres ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant Sysco Corporation ("Sysco" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Sysco for its failure to secure and safeguard the personally identifying information ("PII") of its current and former customers and employees, including Plaintiff.

2. Sysco is a wholesale restaurant food distributor.

3. In or about May 2026 and June 2026, unauthorized third parties gained access to Sysco's network systems and obtained files containing the PII of Sysco's current and former customers and employees, including Plaintiff (the "Data Breach").

4. Sysco owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Sysco breached that duty by, among other things, failing to

implement and maintain reasonable security procedures and practices to protect its current and former customers' and employees' PII from unauthorized access and disclosure.

5. As a result of Sysco's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Michael Torres***

7. Plaintiff Michael Torres is a resident and citizen of Maryland.

8. Plaintiff is a former employee of Sysco. As a condition of providing employment to Plaintiff, Sysco required Plaintiff to provide it with his PII.

9. Plaintiff believed Sysco had implemented and maintained reasonable security and practices to protect his PII. With this belief in mind, Plaintiff provided his PII to Sysco in connection with obtaining employment from Sysco.

10. At all relevant times Sysco stored and maintained Plaintiff's PII on its network systems, including the systems accessed in the Data Breach.

11. Had Plaintiff known that Sysco does not adequately protect the PII in its possession, he would not have obtained employment from Sysco or agreed to entrust it with his PII.

12. Following the Data Breach, Plaintiff received notices from multiple sources, including Malwarebytes, Financial Shield, and Haveibeenpwned, that his PII, such as his name,

email, phone number, and Social Security number, was compromised in the Data Breach and found on the dark web.

13. After the Data Breach, Plaintiff experienced an increase in the number of spam calls, texts, and emails that he receives, including emails claiming his accounts have been hacked and attempting to extort money from him.

14. Plaintiff has also experienced various unauthorized login attempts on his accounts, and has spent time changing his passwords as a result.

15. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; and lost time mitigating the effects of the Data Breach.

***Defendant Sysco Corporation***

16. Defendant Sysco Corporation is a Delaware corporation with its principal place of business located at 1390 Enclave Parkway, Houston, TX 77077. It may be served through its registered agent Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

18. This Court has personal jurisdiction over Defendant because it transacts business within this State and maintains its principal place of business in this District.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant's principal place of business is in this District and a significant amount of the events leading to Plaintiff's causes of action occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Sysco*

20. Sysco is a "global leader in selling, marketing and distributing food and non-food products to restaurants, healthcare and educational facilities, lodging establishments and other customers around the world."[1]

21. In the regular course of its business, Sysco collects and maintains the PII of its current and former customers and employees. Sysco required Plaintiff and Class members to provide it with their PII as a condition of providing them with employment or services.

22. Sysco is aware of the risks of "security breaches," "cyber-attacks," and "theft" to its technology systems.[2] It is also aware that it "experience cybersecurity threats and incidents of varying degrees from time-to-time, including ransomware, ransom-related extortion, and phishing attacks, as well as distributed denial of service attacks and the theft of data."[3]

23. Plaintiff and Class members are current or former customers and employees of Sysco who entrusted Sysco with their PII.

### *The Data Breach*

24. On or about May 6, 2026, the Qilin ransomware gang added Sysco to its dark web data breach website and claimed to have stolen sensitive information from Sysco's network

---

[1] *The Sysco Story*, SYSCO, https://www.sysco.com/about/company-profile/the-sysco-story (last accessed July 10, 2026).

[2] Sysco, *Annual Report (Form 10-K)*, SYSCO (Aug. 21, 2025), https://otp.tools.investis.com/clients/us/sysco1/SEC/sec-show.aspx?FilingId=18716909&Cik=0000096021&Type=PDF&hasPdf=1.

[3] *Id.*

systems.[4] On or about June 16, 2026, the ShinyHunters hacker group also added Sysco to its dark web data breach website, claiming to have stolen over 61 million records including customer and employee data and PII.[5]

25. On information and belief, the PII stolen in the Data Breach includes names, phone numbers, email addresses, addresses, financial and billing information, and tax information.

26. The Qilin group "is a sophisticated cyber threat group that has emerged as a significant player in the ransomware landscape."[6] Qilin "uses a double extortion strategy, meaning that in addition to encrypting data and holding the key for ransom, they steal critical data and threaten to sell or release it."[7] Qilin "practice[s] double extortion and operate[s] a data leak site (DLS) where victims are posted."[8]

27. ShinyHunters is "a notorious black-hat cybercriminal group" that specializes in "large-scale data breaches, extortion, and selling stolen user data on the dark web."[9] After committing a data breach, ShinyHunters' *modus operandi* is to publish or sell the stolen information to other cybercriminals on the dark web.[10]

---

[4] Stefanie Schappert, *Sysco food distributor allegedly hit in Qilin ransomware claim*, CYBERNEWS (May 6, 2026), https://cybernews.com/news/sysco-qilin-ransomware-claim-food-supplier/.

[5] Stefanie Schappert, *Sysco hit by second extortion claim over 61M records, weeks after Qilin ransomware threat*, CYBERNEWS (June 16, 2026), https://cybernews.com/news/sysco-shinyhunters-61-million-salesforce-records/.

[6] *Dark Web Profile: Qilin (Agenda) Ransomware*, SOC RADAR (June 6, 2024), https://socradar.io/blog/dark-web-profile-qilin-agenda-ransomware/.

[7] *Qilin Ransomware – A Double Extortion Campaign*, CYBER FLA. (Dec. 8, 2025), https://cyberflorida.org/qilin-ransomware-a-double-extortion-campaign/.

[8] Office of Information Security, *Qilin, aka Agenda Ransomware, Threat Profile*, HHS (June 18, 2024), https://www.hhs.gov/sites/default/files/qilin-threat-profile-tlpclear.pdf (last accessed June 23, 2026).

[9] Melissa Garcia, *ShinyHunters: Inside the Hacker Group Targeting Your SaaS Data (And How to Stop Them)*, DO CONTROL (May 4, 2026), https://www.docontrol.io/blog/shinyhunters.

[10] *See, e.g.*, Catalin Cimpanu, *A hacker group is selling more than 73 million user records on the dark web*, ZD NET (May 9, 2020 7:10 AM), https://www.zdnet.com/article/a-hacker-group-is-selling-more-than-73-million-user-records-on-the-dark-web/; Garcia, *supra* note 9.

28. Both Qilin and ShinyHunters threatened to release the stolen data on the dark web.[11] As indicated by the alerts Plaintiff received indicating his PII had been found on the dark web in connection with the Sysco Data Breach, the stolen PII has been published on the dark web.

29. Despite learning of the Data Breach in or about May and June, 2026, Sysco has not begun notifying Plaintiff and Class members of the Data Breach. Sysco's failure to promptly notify Plaintiff and Class members that their PII was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendant Knew that Criminals Target PII***

30. At all relevant times, Sysco knew, or should have known, that the PII that it collected and stored was a target for malicious actors. Despite such knowledge, Sysco failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyberattacks that it should have anticipated and guarded against.

31. It is well known among companies that store sensitive personally identifying information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches

[11] Schappert, *supra* n.4; Schappert, *supra* n.5.

are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[12]

32. PII is a valuable property right.[13] The value of PII as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[16] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

33. Criminals piece together bits and pieces of compromised PII for profit by creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more.

34. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly

---

[12] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[16] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

35. The development of "Fullz" packages means that the stolen PII from the Data Breach can easily be used to identify and link it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

36. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals.

37. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

38. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and

accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[17]

39. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII Has Grave and Lasting Consequences for Victims***

40. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[18] [19]

41. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[20]

---

[17] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[18] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed May 13, 2026).

[19] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[20] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

42. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[21]

43. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[22]

44. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was specifically targeted and taken by someone intending to use that information for any number of improper purposes, fraud, and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

45. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII

---

[21] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed May 13, 2026).

[22] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

46. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

47. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information was accessed and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

48. Excluded from the Class are Sysco Corporation and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

49. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

50. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. On information and belief, thousands of individuals' PII was compromised and stolen in the Data Breach.

51. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

d. Whether an implied contract existed between Class members and Defendant, providing that Defendant would implement and maintain reasonable security measures to protect and secure Class members' PII from unauthorized access and disclosure;

e. Whether Defendant breached its duties to protect Plaintiff's and Class members' PII; and

f. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

52. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

53. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

54. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

55. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

56. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

57. Sysco owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII in its possession, custody, or control.

58. Sysco knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII and the importance of maintaining secure systems. Sysco knew or should have known of the many data breaches that targeted businesses that collect and store PII in recent years.

59. Given the nature of Sysco's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Sysco should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

60. Sysco breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

61. It was reasonably foreseeable to Sysco that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

62. But for Sysco's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

63. As a result of Sysco's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their

PII which remains in Sysco's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**<u>COUNT II</u>**
**NEGLIGENCE PER SE**

64. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

65. Defendant's duties arise from, *inter alia*, Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure PII.

66. Defendant's duties also arise from the Maryland Personal Information Protection Act ("MPIPA"), Md. Code Ann., Com. Law § 14-3501, *et seq.*, which requires:

> a business that owns, maintains, or licenses personal information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned, maintained, or licensed and the nature and size of the business and its operations.

Md. Code Ann., Com. Law § 14-3503(a).

67. Defendant violated Section 5 of the FTCA and the MPIPA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

68. Defendant's violations of Section 5 of the FTCA and the MPIPA constitute negligence per se.

69. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA and the MPIPA were intended to protect.

70. The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA and the MPIPA were intended to guard against.

71. It was, or should have been, reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

72. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendant's violations of Section 5 of the FTCA and the MPIPA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Sysco's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a

result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

73. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

74. In connection with receiving employment or services, Plaintiff and all other Class members entered into implied contracts with Sysco.

75. Pursuant to these implied contracts, Plaintiff and Class members paid money or provided their labor to Sysco, and provided Sysco with their PII. In exchange, Sysco agreed to, among other things, and Plaintiff and Class members understood that Sysco would: (1) provide employment or services to Plaintiff and Class members; (2) collect, maintain, and utilize Plaintiff's and Class members' PII to, among other things, facilitate their employment or the provision of services to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; (4) protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations, industry standards, and Sysco's representations; and (5) maintain the confidentiality of Plaintiff's and Class members' PII and protect it from unauthorized access, disclosure, theft, and misuse.

76. The protection of PII was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Sysco, on the other hand. Had Plaintiff and Class members known that Sysco would not adequately protect its customers' and employees' PII, they would not have agreed to provide Sysco with their PII or received employment or services from Sysco.

77. Plaintiff and Class members performed their obligations under the implied contract when they provided Sysco with their PII and provided their labor or paid for services from Sysco.

78. Sysco breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and Class members' PII in a manner that complies with applicable laws, regulations, industry standards, and Sysco's representations.

79. Sysco's breach of its obligations under its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

80. Plaintiff and all other Class members were damaged by Sysco's breach of implied contracts because: (i) they paid or provided their labor in for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft, justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

81. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

82. This claim is pleaded in the alternative to the breach of implied contract claim.

83. Plaintiff and Class members conferred a monetary benefit upon Sysco in the form of monies paid for services or the value of their labor, and through the provision of their PII.

84. Sysco accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Sysco also benefitted from the receipt of Plaintiff's and Class members' PII, as this was used to facilitate its operations and provision of services.

85. As a result of Sysco's conduct, Sysco's current and former customers and employees suffered actual damages in an amount equal to the difference in value between their payments made or labor provided with reasonable data privacy and security practices and procedures that customers and employees paid for, and those payments or labor without reasonable data privacy and security practices and procedures that they received.

86. Sysco should not be permitted to retain the money belonging to Plaintiff and Class members because Sysco failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

87. Plaintiff and Class members have no adequate remedy at law.

88. Sysco should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable under law;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 10, 2026

Respectfully submitted,

*/s/ Bruce W. Steckler*
Bruce W. Steckler
**STECKLER WAYNE PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Tel: 972.387.4040
bruce@stecklerlaw.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

**Pro hac vice* forthcoming